1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

AUGUSTUS MONDRIAN, et al.,

No.  1:19-cv-00884-DAD-SKO

12

Plaintiffs,

13

v.

ORDER GRANTING PRELIMINARY
APPROVAL OF CLASS ACTION
SETTLEMENT AND CONDITIONAL CLASS
CERTIFICATION

14

TRIUS TRUCKING, INC.,

15

Defendant.

(Doc. Nos. 18, 27)

16

17

18       This matter is before the court on plaintiffs' motion for preliminary approval of a class

19  action settlement and conditional certification of a settlement class filed on November 13, 2020

20  and supplemental memorandum in support thereof filed on June 3, 2022.[1]  (Doc. Nos. 18, 27.)

21  Pursuant to General Order No. 617 addressing the public health emergency posed by the COVID-

22  _____

23  [1] The undersigned apologizes for the excessive delay in the issuance of this order.  This court's
    overwhelming caseload has been well publicized and the long-standing lack of judicial resources
    in this district long-ago reached crisis proportion.  While that situation was partially addressed by
24  the U.S. Senate's confirmation of a district judge for one of this court's vacancies on December
    17, 2021, another vacancy on this court with only six authorized district judge positions was
25  created on April 17, 2022.  For over twenty-two months the undersigned was left presiding over
    approximately 1,300 civil cases and criminal matters involving 735 defendants.  That situation
26  resulted in the court not being able to issue orders in submitted civil matters within an acceptable
    period of time and continues even now as the undersigned works through the predictable backlog.
27  This has been frustrating to the court, which fully realizes how incredibly frustrating it is to the
    parties and their counsel.

28

1

19 pandemic, plaintiffs' motion was taken under submission on the papers.  (Doc. No. 19.)  For the reasons explained below, the court will now grant preliminary approval of the proposed settlement as amended in the parties' supplemental memorandum (Doc. Nos. 27, 30) and conditional certification of the settlement class.

**BACKGROUND**

Defendant Trius Trucking, Inc. ("Trius Trucking") is a "transportation company that provides dry and temperature controlled hauls and boasts more than one hundred trucks operating in California."  (Doc. No. 1-5 at 6.)  Plaintiff Augustus Mondrian worked for defendant from February 2016 through April 2016 as a truck driver, and plaintiff Rhonda Jones worked for defendant from March 2016 through September 2016 as a truck driver.  (*Id.* at 6; Doc. No. 18-2 at 5.)

Plaintiff Mondrian originally filed this class action complaint in the Fresno County Superior Court on May 10, 2016.  (Doc. No. 1-1 at 2.)  On January 5, 2017, plaintiff Mondrian, joined by plaintiff Jones, filed a first amended complaint in that court.  (Doc. No. 1-2 at 45.)  On March 27, 2017, plaintiffs filed a second amended complaint, and on May 29, 2019, plaintiffs filed a third amended complaint in state court.  (Doc. Nos. 1-3 at 45; 1-5 at 4.)  Plaintiffs' third amended complaint asserts wage, hour, and other labor-related claims in violation of the California Labor Code, California Business and Professions Code, and federal Fair Labor Standards Act ("FLSA"), which plaintiffs claim give rise to penalties under California's Private Attorney's General Act ("PAGA").  (Doc. No. 1-5 at 4.)  Defendant filed a notice of removal in this court on June 27, 2019 on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1331 as to plaintiffs' FLSA claim and supplemental jurisdiction under 28 U.S.C. § 1367(a) as to plaintiffs' state law claims.  (Doc. No. 1 at 4.)

Thereafter, the parties "engaged in investigation and the exchange of documents and information" relevant to the action, including "payroll and employment data," "tax documentation, wage statements, [and] earnings and other compensation and employment-related materials."  (Doc. No. 18-2 at 6.)  The parties entered into private mediation before Gig Kyriacou, Esq., who plaintiffs' counsel describes as "a respected and experienced mediator for class actions

1   and wage and hour lawsuits." (Doc. Nos. 18-1 at 11; 18-2 at 28.)  Following mediation and

2   "many months of negotiations," the parties agreed to settle the action. (Doc. No. 18-1 at 11.)  On

3   November 13, 2020, plaintiffs filed a motion for conditional certification and preliminary

4   approval of the class and collective action settlement. (Doc. No. 18.)  On March 11, 2022, the

5   court issued an order requiring the parties to file supplemental briefing and/or an amended motion

6   in connection with plaintiffs' pending motion for preliminary approval. (Doc. No. 22.)  On June

7   3, 2022, plaintiffs filed a supplemental memorandum in support of their motion for preliminary

8   approval, which included a revised, but unexecuted settlement agreement between the parties.

9   (Doc. No. 27.)  On June 23, 2022, plaintiffs filed the parties' revised, executed Joint Stipulation

10  of Class Action Settlement and Release of Claims ("Settlement Agreement"). (Doc. No. 30.)

**THE PROPOSED SETTLMENT**

11

12  **A.      The Class**

13          For settlement purposes, the parties request approval of the following class (the "Class")

14  of an estimated 524 individuals (the "Class Members" or "Settlement Class"):  "all individuals

15  who worked for Defendant, Trius Trucking in California as Truck Drivers at any location in

16  California during the time period May 10, 2012 to December 31, 2016." (Doc. No. 30 at 7.)

17  **B.      The FLSA Collective**

18          Plaintiffs do not specify a collective in the terms of their motion or in the parties'

19  Settlement Agreement.  However, the Settlement Agreement defines "FLSA Opt-In Members" as

20  "those Participating Class Members who worked for Defendant during the period May 10, 2013

21  to December 31, 2016 and who timely execute and return the FLSA Consent Form." (Doc. No.

22  30 at 9.)  Similarly, the parties' proposed FLSA Consent Form is addressed "to all individuals

23  who worked for defendant Trius Trucking in California as truck drivers at any location in

24  California during the period May 10, 2013 to December 31, 2016." (*Id.* at 66.)  Therefore, the

25  court will preliminarily approve the following collective (the "FLSA Collective" or "FLSA

26  Members"):  "all individuals who worked for defendant Trius Trucking in California as truck

27  drivers at any location in California during the period May 10, 2013 to December 31, 2016."

28  /////

3

**C.      Aggrieved Employees Under the PAGA**

Plaintiffs have defined "Aggrieved Employees" as "those individuals who worked for Defendant, Trius Trucking in California as Truck Drivers at any location in California during the time period May 10, 2015 to December 31, 2016." (*Id.* at 7.)  Twenty-five percent of the civil PAGA penalties will be paid to the Aggrieved Employees as part of their PAGA Payment Shares, as described below. (*Id.* at 9.)

**D.      The Settlement Period**

For settlement purposes, the parties have defined the "Class Period" as the time period of "May 10, 2012 up through and including December 31, 2016." (*Id.* at 8.)  By contrast, and as described above, the relevant period for the FLSA collective action is May 10, 2013 through December 31, 2016. (*Id.* at 9.)  Further, plaintiffs have defined the "PAGA Period" as extending from May 10, 2015 to December 31, 2016. (*Id.* at 7.)

**E.      The Release of Claims**

The Settlement Agreement defines the Released Parties as "Trius Trucking, Inc. and its past and present parent companies, subsidiaries, divisions, and other affiliated or related employees, current and former employees, officers, directors, agents, representatives, attorneys, insurers, partners, shareholders, representatives, joint venturers, owners, and successors and assigns of each." (*Id.* at 10.)  The Released Claims are defined as:

> all claims, causes of action, and forms of relief that were asserted in the Action, or that arise from or could have been asserted based on any of the facts or circumstances, transactions, events, occurrences, acts, disclosures, statements, omissions, or failures to act, alleged in the Complaint . . . in the Action and any claims which arise out of an identical factual predicate set forth in the Complaint, regardless of whether such claims arise under federal, state and/or local law, statute, ordinance, regulation, common law, or other source of law during the Class Period. The release does not include claims outside the Class Period or claims of harassment, retaliation, discrimination, workers' compensation, disability or wrongful termination.

(*Id.* at 7.)  The Settlement Agreement provides that upon the effective date of the settlement, "each and every Participating Class Member" will "release[], discharge[], and agree[] to hold harmless Defendant and all of the other Released Parties, and each of them, from any and all [of

the Released Claims], except that only FLSA Opt-In Members will release claims for overtime under the Fair Labor Standards Act." (*Id.* at 35.)

In addition, the Settlement Agreement provides for the release of PAGA claims ("Released PAGA Claims"), which are defined as "a release of all PAGA claims alleged in the Complaint . . . in the Action and any claims which arise out of an identical factual predicate set forth in the Complaint." (*Id.* at 35–36.) Notably, "[a]ll Aggrieved Employees will be subject to the release of their Released PAGA Claims . . . whether or not they opt out of the Class." (*Id.* at 36.)

## F.     Summary of the Settlement Terms

Under the proposed settlement, defendant will pay a total of $995,000.00 (the "Qualified Settlement Fund" or "QSF") allocated as follows:  1) up to $248,750 for attorneys' fees and up to $15,000 for plaintiffs' counsel's documented litigation costs; (2) $10,000 incentive awards for each plaintiff; (3) $10,000 in civil PAGA penalties, with $7,500 of the penalties payable to the California Labor and Workforce Development Agency ("LWDA");[2] and (4) up to $15,000 for settlement administration costs.[3] (*Id.* at 18–19, 29–30.)  All employer and employee tax withholdings shall be paid from the QSF. (*Id.* at 29–30.)  The funds in the QSF are non-reversionary, "meaning no amount of the QSF shall revert to [d]efendant for any reason so long as the Settlement is approved and it becomes [f]inal." (*Id.* at 10.)

Assuming these allocations are awarded in full, approximately $688,750 will be available for distribution to Class Members who do not submit a timely and valid election not to participate

---

[2]  Pursuant to the PAGA, 75% of the civil PAGA penalties, or $7,500, will go to the LWDA, and 25%, or $2,500, will be allocated to the Net QSF. (Doc. No. 30 at 30).  *See* Cal. Lab. Code § 2699(i).

[3]  The parties' initial proposed settlement in this action estimated that settlement administration costs would not exceed $25,000. (Doc. No. 18-2 at 83.)  In their supplemental briefing in support of plaintiffs' motion for preliminary approval, the parties state that following the filing of the pending motion, they switched their selected settlement administrator to be ILYM Group, which provided a $15,000 estimate for settlement administration costs in this action, rather than the $25,000 estimate provided to the parties by their initially-selected settlement administrator. (Doc. No. 27 at 4.)  The Settlement Agreement reflects that settlement administration costs are now estimated to be $15,000 in this action; however, the proposed class notice in this action still states that settlement administration costs are estimated to be $25,000. (Doc. No. 30 at 19, 44.)

in the settlement ("Participating Class Members") and FLSA Members who timely and validly

opt-in to the FLSA Collective ("Participating FLSA Members" or "FLSA Opt-In Members").[4]

(*Id.* at 9–10, 31.)  Roughly 10% of this amount, or $65,000, is allocated to a "FLSA Net Fund" to

be distributed to Participating FLSA Members, and the remaining $623,723 is allocated to the

"Net QSF" to be distributed to Participating Class Members.  (*Id.* at 9, 31.)

From the Net QSF, each Participating Class Member's share will be calculated on a *pro
rata* basis based on the number of weeks the Participating Class Member worked for defendant
during the Class Period.[5]  (*Id.* at 31.)  Participating FLSA Members will also receive a share of
the FLSA Net Fund calculated on a *pro rata* basis based on the number of weeks worked by the
Participating FLSA Members.  (*Id.*)

Plaintiffs estimate that Participating Class and FLSA Opt-In Members will receive an
average recovery of $1,239.[6]  (Doc. No. 18-1 at 17.)  Class Members who do not wish to
participate in the settlement must opt-out within forty-five days of the Settlement Administrator
mailing out Notice Packets.  (Doc. No. 30 at 32.)  Similarly, in order to participate in the FLSA
collective, FLSA Members must opt-in by signing and returning the FLSA Consent Form within
forty-five days of the Settlement Administrator mailing out Notice Packets.  (*Id.* at 25.)  As noted
above, Class Members who decline to participate in the settlement, but who constitute Aggrieved

---

[4]  In order to opt-in, FLSA Members must sign an FLSA Consent Form which states that by
signing, the FLSA Member agrees "to be bound by the approved terms of the settlement and to
release my Fair Labor Standards Act claims for the period May 10, 2013 to December 31, 2016."
(Doc. No. 30 at 67.)

[5]  Each Participating Class Member must cash their settlement check within 180 days of the
check's date of issuance.  (Doc. Nos. 30 at 32.)  If a check remains uncashed after the 180-day
period, or if an envelope mailed to a Participating Class Member is returned and no forwarding
address can be identified by the Settlement Administrator, then any unclaimed funds will be paid
to the California Controller's Unclaimed Property Fund in the name of the Participating Class
Member.  (*Id.*)  If an envelope mailed to a Participating Class Member is returned and re-mailed
by the Settlement Administrator, any re-issued checks shall be valid for 180 days after the re-
issuance.  (*Id.*)

[6]  This estimated average was submitted by plaintiffs prior to their filing of supplemental briefing
in connection with their motion for preliminary approval.  (*See* Doc. No. 18-1 at 17.)  Plaintiffs
are directed to provide an updated estimate in their motion for final approval.

1  Employees, "will be sent their share of the [$2,500.00] PAGA Payment and will be subject to the

2  release of the Released PAGA Claims . . . whether or not they opt out of the Class."  (*Id.* at 30.)

3  Accordingly, Aggrieved Employees will "be bound by the portions of this Settlement relating to

4  the settlement and release of those claims."  (*Id.* at 24.)

5       If five percent or more of the Class Members opt-out of the settlement, defendant may

6  elect to rescind the settlement, such that the settlement will become null and void.  (*Id.* at 26–28.)

7  Defendant must exercise this option within fourteen calendar days of the date that the Settlement

8  Administrator notifies the parties as to the total number of Class Members who opt-out.  (*Id.* at

9  26.)

10                              **LEGAL STANDARDS**

11  **A.     Rule 23 Settlements**

12       Class actions require the approval of the district court before settlement.  Fed. R. Civ. P.

13  23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for

14  purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the

15  court's approval.").  "Approval under 23(e) involves a two-step process in which the Court first

16  determines whether a proposed class action settlement deserves preliminary approval and then,

17  after notice is given to class members, whether final approval is warranted."  *Nat'l Rural*

18  *Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

19       The first step in the two-step process is preliminary approval.  During preliminary

20  approval, the court conducts a preliminary fairness evaluation to determine if notice of the class

21  action settlement should issue to class members and, if applicable, whether the proposed

22  settlement class should be certified.  *See* David F. Herr, *Ann. Manual Complex Lit.* § 21.632 (4th

23  ed.).  Under Rule 23(e)(1), the court must direct notice to all class members who would be bound

24  by the settlement proposal if the parties show that "the court will likely be able to:"  (i) approve

25  the proposal under Rule 23(e)(2)'s fair, reasonable, and adequate standard; and (ii) certify the

26  proposed settlement class.  Fed. R. Civ. P. 23(e)(1); *see also Lounibos v. Keypoint Gov't Sols.*

27  *Inc.*, No. 12-cv-00636-JST, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re*

28  *Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)) (noting that federal

courts generally grant preliminary approval if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval").

The second step is the final approval.  During final approval, "[i]f the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In doing so, the court must consider several factors, including whether:  "the class representatives and class counsel have adequately represented the class"; "the proposal was negotiated at arm's length"; "the proposal treats class members equitably relative to each other"; and "the relief provided for the class is adequate."  *Id.* When considering whether "the relief provided for the class is adequate," the court should also take into account:

> (i) the costs, risks, and delay of trial and appeal;
>
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>
> (iv) any agreement required to be identified under Rule 23(e)(3).

*Id.*  In addition to the two-step review process, Rule 23(e) also requires that:  (i) the parties seeking approval file a statement identifying the settlement agreement; (ii) class members be given an opportunity to object; and (iii) no payment be made in connection with forgoing or withdrawing an objection, or forgoing, dismissing, or abandoning an appeal.  Fed. R. Civ. P. 23(e)(3), (5).

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks and citations omitted).  To protect the rights of absent class members, Rule 23(e) requires that the court approve such settlements "only after a fairness hearing and a determination that the settlement is fair, reasonable, and adequate."  *Id.* at

946.  When approval is sought of a settlement negotiated before formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement."  *Id.*  In such circumstances, the "settlement approval requires a higher standard of fairness" and a "more exacting review" so as "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent."  *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (internal quotation marks and citations omitted).  Rule 23 also "demand[s] undiluted, even heightened, attention" to the certification requirements when class certification is sought only for purposes of settlement.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  Accordingly, the district court must examine the propriety of certification under Rule 23 both at this preliminary stage and at a later fairness hearing.  *See, e.g.*, *Ogbuehi v. Comcast*, 303 F.R.D. 337, 344 (E.D. Cal. Oct. 2, 2014).

**B.     FLSA Settlements**

The FLSA permits employees to file civil actions against employers who abridge the FLSA's guarantees.  29 U.S.C. § 216(b); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013) ("The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract.").  Employees may bring collective actions under the FLSA, representing all "similarly situated" employees, but "each employee [must] opt-in to the suit by filing a consent to sue with the district court."  *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1064 (9th Cir. 2000).  Because an employee cannot waive claims under the FLSA, the claims may not be settled without court approval or U.S. Department of Labor supervision.  *Beidleman v. City of Modesto*, No. 1:16-cv-01100-DAD-SKO, 2018 WL 1305713, at *1 (E.D. Cal. Mar. 13, 2018) (citing *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981)).  The decision to certify a FLSA collective action is within the discretion of the district court.  *See Edwards v. City of Long Beach*, 467 F. Supp. 2d 986, 989 (C.D. Cal. 2006).

Although the Ninth Circuit has not established criteria to evaluate FLSA settlements, district courts in this circuit routinely apply the standard employed in the Eleventh Circuit, which examines whether a settlement is a fair and reasonable resolution of a *bona fide* dispute.  *See, e.g.*, *Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016) (citing

1    *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352–53 (11th Cir. 1982)); *Nen Thio v.*

2    *Genji, LLC*, 14 F. Supp. 3d 1324, 1333 (N.D. Cal. 2014) (same).  "A *bona fide* dispute exists

3    when there are legitimate questions about the existence and extent of defendant's FLSA liability."

4    *Kerzich v. Cnty. of Tuolumne*, 335 F. Supp. 3d 1179, 1184 (E.D. Cal. 2018) (citation omitted).  A

5    court will not approve a settlement when there is certainty that the FLSA entitles plaintiffs to the

6    compensation they seek because doing so would shield employers from the full cost of complying

7    with the statute.  *Id.*

8          If a *bona fide* dispute between the parties exists, "[c]ourts often apply the Rule 23 factors

9    in evaluating the fairness of an FLSA settlement, while recognizing that some do not apply

10   because of the inherent differences between class actions and FLSA actions."  *Khanna v. Inter-*

11   *Con Sec. Sys., Inc.*, No. 2:09-cv-02214-KJM-EFB, 2013 WL 1193485, at *2 (E.D. Cal. Mar. 22,

12   2013) (internal quotation marks and citations omitted).  The factors include

13             the strength of the plaintiffs' case; the risk, expense, complexity,
              and likely duration of further litigation; the risk of maintaining class
14             action status throughout the trial; the amount offered in settlement;
              the extent of discovery completed and the stage of the proceedings;
15             the experience and views of counsel; the presence of a
              governmental participant; and the reaction of the class members to
16             the proposed settlement.

17   *Khanna v. Intercon Sec. Sys., Inc.*, No. 2:09-cv-2214-KJM-EFB, 2014 WL 1379861, at *6 (E.D.

18   Cal. Apr. 8, 2014), *order corrected*, 2015 WL 925707 (E.D. Cal. Mar. 3, 2015) (quoting *Hanlon*

19   *v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart*

20   *Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)).

21          District courts in this circuit have also taken note of the "unique importance of the

22   substantive labor rights involved" in settling FLSA actions and adopted a "totality of

23   circumstances approach that emphasizes the context of the case."  *Selk*, 159 F. Supp. 3d at 1173.

24   Under this approach, a "district court must ultimately be satisfied that the settlement's overall

25   effect is to vindicate, rather than frustrate, the purposes of the FLSA."  *Id.*  In connection with this

26   approach, the district court's "obligation is not to act as caretaker but as gatekeeper, so that FLSA

27   settlements do not undermine the Act's purposes."  *Kerzich*, 335 F. Supp. 3d at 1185 (citation

28   /////

1  omitted).  Thus, only settlements that reflect a fair and reasonable compromise of issues actually

2  in dispute may be approved by the court.  *Id.* (citation omitted).

3  **C.      PAGA Settlements**

4          Under PAGA, an "aggrieved employee" may bring an action for civil penalties for labor

5  code violations on behalf of herself and other current or former employees.  Cal. Lab. Code

6  § 2699(a).[7]  A plaintiff suing under PAGA "does so as the proxy or agent of the state's labor law

7  enforcement agencies."  *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009).  Thus, a judgment

8  in a PAGA action "binds all those, including nonparty aggrieved employees, who would be

9  bound by a judgment in an action brought by the government."  *Id.*

10         The PAGA statute imposes several limits on litigants.  First, because a PAGA action

11  functions as a "substitute" for an action brought by the state government, a plaintiff suing under

12  PAGA is limited to recovery of civil penalties only, rather than damages or unpaid wages

13  available privately through direct or class action claims.  *Iskanian*, 59 Cal. 4th at 381; *ZB, N.A. v.*

14  *Superior Court*, 8 Cal. 5th 175, 182, 193 (2019), *rev'd in part on other grounds*, *Viking River*

15  *Cruises, Inc. v. Moriana*, 596 U.S. —, — S. Ct. — (2022)*.*  Second, to bring an action under

16  PAGA, an aggrieved employee must first provide written notice to the LWDA as well as to the

17  employer.  Cal. Lab. Code § 2699.3(a)(1).  Third, any civil penalties recovered must be divided

18  75% with the LWDA and 25% with the aggrieved employees.  *Id.* § 2699(i).  Fourth, and finally,

19  the proposed settlement must be submitted to the LWDA, and a trial court must "review and

20  approve" any settlement of PAGA claims.  *Id.* § 2699(l)(2); *see also Haralson v. U.S. Aviation*

21  *Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (citation omitted) (noting that because

22  settling a PAGA claim "compromises a claim that could otherwise be brought be the state," it

23  requires that a court "review and approve any settlement of any civil action pursuant to

24  [PAGA]").

25  /////

26

27  _____

[7] An "aggrieved employee" is defined as "any person who was employed by the alleged violator
and against whom one or more of the alleged violations was committed."  Cal. Lab. Code
28  § 2699(c).

11

Although there is no binding authority setting forth the proper standard of review for PAGA settlements, California district courts "have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes.'" *Haralson*, 383 F. Supp. 3d at 972. This standard is derived principally from the LWDA itself. In commenting on a proposed settlement including both class action and PAGA claims, the LWDA offered the following guidance:

> It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

*O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's guidance with approval).[8] Recognizing the distinct issues presented by class actions, this court is persuaded by the LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in evaluating the PAGA portion of the settlement now before the court. *See, e.g.*, *Castro v. Paragon Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *6 (E.D. Cal. Apr. 27, 2020); *Patel v. Nike Retail Servs., Inc.*, No. 14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May 8, 2019). Accordingly, the court will approve a settlement of PAGA claims upon a showing that the settlement terms (1) meet the statutory requirements set forth by PAGA; and (2) are fundamentally fair, reasonable, and adequate in view of PAGA's public policy goals.

When a proposed settlement involves overlapping class action and PAGA claims, courts may employ a "sliding scale" in determining if the proposed settlement is "fundamentally fair, reasonable, and adequate with reference to the public policies underlying the PAGA." *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*); *McClure v. Brand Energy Serv., LLC*, No. 2:18-cv-01726-KJM-AC, 2021 WL 2168149, at *10 (E.D. Cal. May 27, 2021) (same); *Cooks v. TNG GP*, No. 2:16-cv-01160-KJM-AC, 2020 WL

---

[8] The LWDA has also stated that it "is not aware of any existing case law establishing a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action." *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC (N.D. Cal. Jul. 29, 2016) (Doc. No. 736 at 2–3).

5535397, at *9–10 (E.D. Cal. Sept. 15, 2020) (same).  As the district court in *O'Connor* explained:

> For example, if the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled. By providing fair compensation to the class members as employees and substantial monetary relief, a settlement not only vindicates the rights of the class members as employees, but may have a deterrent effect upon the defendant employer and other employers, an objective of PAGA. Likewise, if the settlement resolves the important question of the status of workers as employees entitled to the protection of the Labor Code or contained substantial injunctive relief, this would support PAGA's interest in "augmenting the state's enforcement capabilities, encouraging compliance with Labor Code provisions, and deterring noncompliance."

*Id.* at 1134–1135 (quoting the LWDA's guidance).  At the same time, where "the compensation to the class amounts is relatively modest when compared to the verdict value, the non-monetary relief is of limited benefit to the class, and the settlement does nothing to clarify [aggrieved workers' rights and obligations], the settlement of the non-PAGA claims does not substantially vindicate PAGA."  *Id.* at 1135.  Finally, "where plaintiffs bring a PAGA representative claim, they take on a special responsibility to their fellow aggrieved workers who are effectively bound by any judgment."  *Id.* at 1134.  Plaintiff's special responsibility to other aggrieved workers is especially significant because "PAGA does not require class action procedures, such as notice and opt-out rights."  *Id.*  Thus,

> [t]he Court must be cognizant of the risk that despite this responsibility, there may be a temptation to include a PAGA claim in a lawsuit to be used merely as a bargaining chip, wherein the rights of individuals who may not even be members of the class and the public may be waived for little additional consideration in order to induce the employer to agree to a settlement with the class.

*Id.*

## ANALYSIS

**A.     Preliminary Class Certification**

      1.     <u>Rule 23(a) Requirements</u>

The class action is a procedural mechanism whereby the "usual rule that litigation be conducted by and on behalf of the named parties only" is swept aside so that multiple parties—

1  unwieldy in number but possessing similar or identical claims—may pursue common redress in

2  an efficient and economical manner.  *Comcast v. Behrend*, 569 U.S. 27, 33 (2013) (citation

3  omitted).  Here, the parties seek preliminary certification of the proposed class under Federal

4  Rule of Civil Procedure 23, which controls class certification and imposes a two-step process in

5  deciding whether a class may be certified.

6      First, Rule 23(a) requires the moving party to demonstrate the existence of four

7  prerequisites:  (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy.  *See Lozano v.*

8  *AT&T Wireless Services, Inc.*, 504 F.3d 718, 730 (9th Cir. 2007).  If, and only if, a putative class

9  satisfies these four requirements may it then proceed to show it also satisfies the requirements of

10  Rule 23(b).  The party seeking class certification bears the burden of establishing conformity with

11  these two rules and must do so by producing facts "affirmatively demonstrat[ing]" that

12  certification is warranted.  *Comcast*, 569 U.S. at 33.  Only after conducting a "rigorous analysis"

13  of these facts and determining they show "actual, [and] not presumed, conformance" with Rule

14  23(a) and (b), may a district court certify a class.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

15  981 (9th Cir. 2011) (citation omitted); *see also Patel v. Nike Retail Servs., Inc.*, Case No. 14-cv-

16  4781-RS, 2016 WL 1241777, at *3 (N.D. Cal. Mar. 29, 2016) ("This 'rigorous' analysis applies

17  both to Rule 23(a) and Rule 23(b).").  If a court decides to certify a class, it must define the class

18  claims and issues and appoint class counsel.  Fed. R. Civ. P. 23(c)(1), (g).

19          a.      *Numerosity*

20      A proposed class must be "so numerous that joinder of all members is impracticable."

21  Fed. R. Civ. P. 23(a)(1).  The numerosity requirement demands "examination of the specific facts

22  of each case and imposes no absolute limitations."  *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S.

23  318, 330 (1980).  Although courts have found that a class of 40 individuals is sufficient under

24  Rule 23, this metric is not a bright line requirement.  *Rannis v. Recchia*, 380 Fed. App'x. 646, 651

25  (9th Cir. 2010) ("The numerosity requirement is not tied to any fixed numerical threshold . . . . In

26  general, courts find the numerosity requirement satisfied when a class includes at least 40

27  /////

28  /////

1   members.").[9]  Courts have found the numerosity requirement satisfied when the class comprises

2   as few as thirty-nine members or where joining all class members would serve only to impose

3   financial burdens and clog the court's docket.  *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D.

4   468, 474 (E.D. Cal. 2010) (citation omitted) (discussing Ninth Circuit thresholds for numerosity

5   and listing cases).  Here, plaintiffs estimate that there are approximately 524 members in the

6   settlement class.  (Doc. No. 18-1 at 26.)  This showing with respect to numerosity is adequate to

7   meet the requirements of Rule 23(a)(1).

8              b.      *Commonality*

9         Rule 23(a) also requires "questions of law or fact common to the class."  Fed. R. Civ. P.

10  23(a)(2).  To satisfy the commonality requirement, the class representatives must demonstrate

11  that common points of facts and law will drive or resolve the litigation.  *See Wal-Mart Stores,*

12  *Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  "[C]ommonality requires that the class members' claims

13  depend upon a common contention such that determination of its truth or falsity will resolve an

14  issue that is central to the validity of each claim in one stroke," and the "plaintiff must

15  demonstrate the capacity of classwide proceedings to generate common answers to common

16  questions of law or fact that are apt to drive the resolution of the litigation."  *Mazza v. Am. Honda*

17  *Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350).  For example,

18  "[c]ommonality is generally satisfied where the lawsuit challenges a system-wide practice or

19  policy that affects all of the putative class members."  *Benitez v. W. Milling, LLC*, No. 1:18-cv-

20  01484-SKO, 2020 WL 309200, at *5 (E.D. Cal. Jan. 21, 2020) (internal quotation marks and

21  citations omitted).

22        The rule does not require all questions of law or fact to be common to every single class

23  member and "[d]issimilarities among class members do not [necessarily] impede the generation

24  of common answers to those questions[.]"  *Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014);

25  *see also Hanlon*, 150 F.3d at 1019 (noting that commonality can be found through "[t]he

26  existence of shared legal issues with divergent factual predicates").  However, the raising of

27  _____

28  [9]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1    merely any common question does not suffice.  *See Wal-Mart*, 564 U.S. at 349 ("Any

2    competently crafted class complaint literally raises common 'questions.'") (quoting Richard A.

3    Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 131–32

4    (2009)).

5            Plaintiffs assert that the Class Members in this case were "subject to common policies and

6    practices concerning meal and rest periods and compensation based on miles driven," and

7    defendant "engaged in uniform practices with respect to the Class Members."  (Doc. No. 18-1 at

8    27.)  According to plaintiffs, the common questions of law and fact present in this case include:

9            whether Defendant's employment and piece-rate practices were
             lawful, whether Defendant failed to properly pay wages for time
10           worked including overtime, whether Defendant failed to properly
             provide and/or pay for meal and rest periods, whether Defendant's
11           conduct was willful, and whether the Class is entitled to
             compensation and related penalties.
12

13   (*Id.* at 26.)

14           Because the above allegations and questions "would form the basis of each of the

15   plaintiff's claims," the court finds that the commonality requirement is satisfied here.  *See Bykov*

16   *v. DC Transportation Servs.*, Inc., No. 2:18-cv-1691-DB, 2019 WL 1430984, at *3 (E.D. Cal.

17   Mar. 29, 2019) (citation omitted).

18                    c.      *Typicality*

19           "The typicality requirement looks to whether the claims of the class representatives are

20   typical of those of the class and is satisfied when each class member's claim arises from the same

21   course of events, and each class member makes similar legal arguments to prove the defendant's

22   liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citations and internal

23   quotation marks omitted); Fed. R. Civ. P. 23(a)(3).  While representative claims must be

24   "reasonably co-extensive with those of absent class members," they "need not be substantially

25   identical."  *Hanlon*, 150 F.3d at 1020; *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508

26   (9th Cir. 1992).

27           Here, plaintiffs state that they, "like every other member of the Class, [were] employed by

28   Defendant as a truck driver during the Class Period" and were "subject to the same employment

16

1  practices concerning piece-rate compensation [and] time worked and rest periods."  (Doc. No. 18-

2  1 at 28.)  To that end, they argue that the claims of the plaintiffs and the Class Members "arise

3  from the same course of conduct by the defendant, involve the same employment policies, and are

4  based on the same legal theories."  (*Id.*)

5       Because the proposed class consists of individuals who worked for defendant as truck

6  drivers and were allegedly subjected to the same "uniform practices" described above, the court

7  finds that plaintiffs' claims are "reasonably co-extensive with those of absent class members."

8  *Hanlon*, 150 F.3d at 1020.  Thus, the typicality requirement is satisfied here.

9                  d.   *Adequacy of Representation*

10       The final Rule 23(a) prerequisite is satisfied if "the representative parties will fairly and

11  adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Resolution of this issue

12  requires the court to address the following questions:  "(a) do the named plaintiffs and their

13  counsel have any conflicts of interest with other class members and (b) will the named plaintiffs

14  and their counsel prosecute the action vigorously on behalf of the class?"  *Sali v. Corona Reg'l*

15  *Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018); *see also Pierce v. County. of Orange*, 526 F.3d

16  1190, 1202 (9th Cir. 2008).  "Adequacy of representation also depends on the qualifications of

17  counsel."  *Sali*, 909 F.3d at 1007 (citation omitted).

18       Plaintiffs contend that the adequacy of representation requirement is met here because

19  plaintiffs "do not have interests antagonistic to those of the class" and "have actively participated

20  in the prosecution of this case to date," including through communicating with counsel, providing

21  documents to counsel, and participating "extensively" in discovery, investigation, and

22  negotiations in the action.  (Doc. No. 18-1 at 28–29.)  According to plaintiffs, their personal

23  involvement was "essential to the prosecution of the [a]ction and the monetary settlement

24  reached," and their adequacy is further reflected in their decision to retain experienced counsel.

25  (*Id.* at 29.)  Based on these assertions and the above description of plaintiffs' claims, the court is

26  satisfied that plaintiffs interests align with those of the proposed Class Members and that

27  plaintiffs would vigorously prosecute the action on behalf of the class.

28  /////

Plaintiffs' counsel also submitted a declaration and law firm resume to establish their adequacy as class counsel.  (Doc. Nos. 18-2 at 1–19, 107–121.)  According to his law firm resume, Attorney Kyle R. Nordrehaug of the firm Blumenthal Nordrehaug Bhowmik De Blouw LLP has been practicing law since 1999, and his practice areas include consumer and securities class actions, wage and hour class actions, and civil litigation.  (*Id.* at 107.)  Attorney Nordrehaug represents that attorneys at his firm have "extensive class litigation experience" and "have handled a number of employment class actions and complex cases and have acted both as counsel and as lead and co-counsel in a variety of those matters," including matters involving "nearly identical claims brought on behalf of truck drivers."  (*Id.* at 14–15.)  In support of Attorney Nordrehaug's assertion that his firm has been involved as class counsel in "hundreds of wage and hour class action matters," his law firm lists on its resume well over 100 class action and representative cases on which his firm has worked.  (*Id.* at 15, 110–121.)  In addition, plaintiffs state in their motion that their attorneys are "competent, experienced in class litigation, and generally able to conduct the proposed litigation without conflicts."[10]  (Doc. No. 18-1 at 28.)

Because plaintiff and class counsel represent that there are no conflicts of interest with the Class Members and Blumenthal Nordrehaug Bhowmik De Blouw LLP appears to be experienced in class action litigation, the court finds that the adequacy of representation requirement has been preliminarily satisfied.

    2.    Rule 23(b)(3) Requirements

The parties seek class certification under Rule 23(b)(3), which requires that:  (1) the questions of law or fact common to class members predominate over any questions affecting only individual members; and (2) a class action be superior to other available methods for fairly and efficiently adjudicating the controversy.  *See Amchem*, 521 U.S. at 615; *In re Hyundai and Kia Fuel Economy Litigation*, 926 F.3d 539, 556 (9th Cir. 2019) (*en banc*).  The test of Rule 23(b)(3)

/////

---

[10]  In plaintiffs' motion for final approval, plaintiffs' counsel are directed to provide a complete explanation for their assertion that they are "*generally* able to conduct the proposed litigation without conflicts" and to clearly confirm whether the firm has conflicts of interest with plaintiffs or any of the Class Members.  (*See* Doc. No. 18-1 at 28 (emphasis added).)

1  is "far more demanding" than that of Rule 23(a).  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617

2  F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623–24).

3             a.     *Predominance*

4       First, common questions must "predominate" over any individual questions.  While this

5  requirement is similar to the Rule 23(a)(2) commonality requirement, the standard is higher at this

6  stage of analysis.  *Dukes*, 564 U.S. at 359.  While Rule 23(a)(2) can be satisfied by even a single

7  question, Rule 23(b)(3) requires convincing proof that common questions "predominate" over

8  individual questions.  *Amchem*, 521 U.S. at 623–24.  "An individual question is one where

9  'members of a proposed class will need to present evidence that varies from member to member,'

10  while a common question is one where 'the same evidence will suffice for each member to make

11  a *prima facie* showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Tyson*

12  *Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting W. Rubenstein, *Newberg on Class*

13  *Actions* § 4:50, pp. 196–197 (5th ed. 2012)).  "When common questions present a significant

14  aspect of the case and can be resolved for all members of the class in a single adjudication, there

15  is clear justification for handling the dispute on a representative rather than on an individual

16  basis."  *Hanlon*, 150 F.3d at 1022.

17       As discussed above, plaintiffs challenge defendant's "uniform" policy of paying truck

18  drivers by piece-rate compensation, which allegedly deprived Class Members of statutorily

19  required meal and rest periods and compensation for hours worked.  (Doc. No. 18-1 at 30.)  Class

20  actions in which a defendant's uniform policies are challenged generally satisfy the predominance

21  requirement of Rule 23(b)(3).  *See, e.g.*, *Castro*, 2020 WL 1984240, at *6; *Palacios v. Penny*

22  *Newman Grain, Inc.*, No. 1:14-cv-01804-KJM-SAB, 2015 WL 4078135, at *5–6 (E.D. Cal. July

23  6, 2015); *Clesceri v. Beach City Investigations & Protective Servs., Inc.*, No. 10-cv-03873-JLS-

24  RZ, 2011 WL 320998, at *7 (C.D. Cal. Jan. 27, 2011).  The court therefore concludes that the

25  predominance requirement has been met in this case.

26             b.     *Superiority*

27       Rule 23(b)(3) also requires a court to find that "a class action is superior to other available

28  methods for the fair adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  To resolve the

1    Rule 23(b)(3) superiority inquiry, "the court should consider class members' interests in pursuing

2    separate actions individually, any litigation already in progress involving the same controversy,

3    the desirability of concentrating in one forum, and potential difficulties in managing the class

4    action—although the last two considerations are not relevant in the settlement context." *See*

5    *Palacios*, 2015 WL 4078135, at *6 (citing *Schiller v. David's Bridal Inc.*, No. 10-cv-00616-AWI-

6    SKO, 2012 WL 2117001, at *10 (E.D. Cal. June 11, 2012)).

7        Here, plaintiffs assert that the superiority requirement is satisfied because the proposed

8    settlement "ends risky, protracted and expensive litigation." (Doc. No. 18-1 at 30.) In addition,

9    they argue that the proposed settlement provides for "significant payments" to Class Members

10   who otherwise would not bring their claims in individual lawsuits due to fear of potential

11   retaliation, fear of repercussions with future employment, and a lack of "time, resources, and

12   understanding to bring a lawsuit against their well-funded employer." (*Id.* at 30–31.)

13       Given that "[a] common nucleus of facts and potential legal remedies" predominate, the

14   court finds that these questions can be resolved for all members more efficiently and

15   expeditiously in a single action. *Hanlon*, 150 F.3d at 1022. Therefore, the court is satisfied that

16   the superiority requirement has been met here.

17       Accordingly, for all the forgoing reasons, the requirements for preliminary certification

18   under Rule 23 have been satisfied, and the court finds that conditional certification of the Class is

19   appropriate.

20       **B.    Conditional Certification of FLSA Collective Action**

21       Plaintiffs seeking conditional certification of a collective action under the FLSA have the

22   burden to show that they are "similarly situated" to other employee class members. *Nen Thio*, 14

23   F. Supp. 3d at 1340. Plaintiffs can show they are "similarly situated by making substantial

24   allegations, supported by declarations or discovery, that the putative class members were together

25   the victims of a single decision, policy, or plan." *Rodriguez v. Danell Custom Harvesting, LLC*,

26   293 F. Supp. 3d 1117, 1130 (E.D. Cal. 2018) (quoting *Nen Thio*, 14 F. Supp. 3d at 1340) (internal

27   quotation marks omitted). Courts are to apply a lenient standard when determining whether to

28   /////

conditionally certify a collective.  *See Syed v. M-I, L.L.C.*, No. 1:12-cv-01718-AWI-MJS, 2014 WL 6685966, at *2 (E.D. Cal. Nov. 26, 2014).

Here, the proposed FLSA collective consists of all individuals who worked for defendant Trius Trucking in California as truck drivers at any location in California during the period May 10, 2013 to December 31, 2016.  (*See* Doc. No. 30 at 9, 66.)

For all the reasons the court has found the Class satisfies the requirements for preliminary certification under Rule 23, the proposed FLSA collective is also found to satisfy the FLSA's less stringent requirement that the members be "similarly situated."  Conditional certification of the FLSA Collective is therefore found to be appropriate.

**C.     Preliminary Settlement Approval**

Plaintiff also seeks preliminary approval of the settlement.  Under Rule 23(e), a court may approve a class action settlement only if it is a fair, reasonable, and adequate resolution of the dispute.  *Bluetooth*, 654 F.3d at 946.  "[P]reliminary approval of a settlement has both a procedural and substantive component."  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079 (citation omitted).  In particular, preliminary approval of a settlement and notice to the proposed class is appropriate if:  (1) the proposed settlement appears to be the product of serious, informed, non-collusive negotiations; and (2) the settlement falls within the range of possible approval, has no obvious deficiencies, and does not improperly grant preferential treatment to class representatives or segments of the class.  *Id.*

Because the proposed settlement also has PAGA and FLSA components, the settlement must also meet certain requirements under those acts.  The court will first address in turn whether these requirements have been met.

1.     The PAGA Component

PAGA requires that a proposed settlement be submitted to the LWDA.  Cal. Lab. Code at § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (noting that a proposed settlement should be submitted to the LWDA to allow it to comment if it so desires (citing *Ramirez v. Benito Valley Farms, LLC*, No. 16-cv-04708-LHK, 2017 WL 3670794, at *2 (N.D. Cal. Aug. 25, 2017))).

1    Here, plaintiffs aver that the initial proposed settlement in this action was submitted to the

2    LWDA on December 2, 2020, and the revised Settlement Agreement was being served on the

3    LWDA simultaneous with the supplemental briefing being filed in this court.[11]  (Doc. No. 27 at

4    10.)  The parties have not disclosed whether the LWDA has commented on the settlement to

5    date.[12]  The court will address the fairness, reasonableness, and adequacy of the PAGA penalties

6    below.

7         2.    The FLSA Component

8    In moving for preliminary approval, plaintiffs do not explicitly state that there is a *bona*

9    *fide* dispute regarding whether defendant complied with the FLSA's wage and overtime

10   compensation requirements.  Nonetheless, such a dispute is apparent from the face of plaintiffs'

11   pending motion and the parties' Settlement Agreement.  Plaintiffs assert that defendant violated

12   the FLSA by failing to properly pay straight and overtime wages.  (Doc. No. 30 at 13; *see also*

13   Doc. No. 1-4 at 100–102.)  On the other hand, defendant "vigorously denies and continues to

14   deny all of the material allegations asserted in the Action, and denies that it has violated any wage

15   and hour law or wage payment or any other law or obligation of any kind to Plaintiffs or any of

16   the Class Members."  (Doc. No. 30 at 13.)  Indeed, according to the proposed Class Notice in this

17   case, defendant "denies that it did anything wrong and . . . entered into the Settlement solely for

18   the purpose of resolving the Action."  (*Id.* at 44.)

19   Because the court is satisfied that a *bona fide* dispute exists in this case, it will also

20   evaluate the fairness of the proposed settlement of the FLSA claims.  *See McKeen-Chaplin v.*

21   *Franklin Am. Mortg. Co.*, No. 10-cv-5243-SBA, 2012 WL 6629608, at \*2 (N.D. Cal. Dec. 19,

22   2012) (finding a *bona fide* dispute in part because of disputes over the proper damages measure

23   ─────────────────

24   [11]  Plaintiffs do not state whether they submitted notice of the proposed settlement to the
appropriate federal and state officials, as is required by the Class Action Fairness Act ("CAFA")

25   pursuant to 28 U.S.C. § 1715(b).  Under § 1715(b), each participating defendant must serve
notice of the proposed settlement upon certain state and federal officials within ten days of the

26   filing of the proposed settlement.  The parties are directed to inform the court in their motion for
final approval whether and when they provided such notice in accordance with § 1715(b).

27

28   [12]  In their motion for final approval, plaintiffs are directed to specify whether the LWDA has
commented on the proposed settlement.

1   and the amount of overtime hours that the plaintiffs actually worked); *Nen Thio*, 14 F. Supp. 3d at

2   1340 (noting that a *bona fide* dispute can exist over issues such as the "computation of back

3   wage") (quoting *Yue Zhou v. Wang's Rest.*, No. 05-cv-0279-PVT, 2007 WL 2298046, at *1 (N.D.

4   Cal. Aug. 8, 2007)).

5               3.      Procedural Fairness

6               Having addressed whether the applicable PAGA and FLSA requirements have been met,

7   the court must next consider whether the process by which the parties arrived at the settlement is

8   the product of arm's-length bargaining, rather than collusion or fraud.  *See Millan v. Cascade*

9   *Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).  A settlement is presumed to be fair if it

10  "follow[s] sufficient discovery and genuine arm[']s-length negotiation."  *Adoma v. Univ. of Phx.,*

11  *Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) (citation omitted).  In addition, the parties'

12  participation in mediation "tends to support the conclusion that the settlement process was not

13  collusive."  *Palacios*, 2015 WL 4078135, at *8 (citation omitted).

14              Here, as indicated above, the parties entered into private mediation before Gig Kyriacou,

15  Esq., an experienced professional mediator, on November 1, 2016.  (Doc. Nos. 18-1 at 14, 30 at

16  13.)  The mediation took place after approximately six months of litigation, and prior to

17  mediation, defendant provided plaintiffs and class counsel with "payroll and employment data

18  and other information regarding the Class Members, various internal documents, tax

19  documentation, wage statements, earnings and other compensation and employment-related

20  materials, including documents related to pay."  (Doc. Nos. 18-1 at 14; 30 at 12.)  In advance of

21  mediation, plaintiffs' counsel analyzed the data provided by defendant with the assistance of a

22  damages expert, DM&A, and submitted a mediation brief to Mediator Kyriacou.  (Doc. No. 18-1

23  at 14.)  According to the parties' Settlement Agreement, the mediation was conducted in "good-

24  faith" and at "arms-length," and the parties were not able to reach an agreement to settle the

25  action until after the conclusion of the mediation session, upon a proposal by Mediator Kyriacou.

26  (Doc. No. 30 at 13.)  In sum, plaintiffs assert that the settlement was the result of "extensive and

27  hard-fought negotiations" involving "capable advocacy on all sides."  (Doc. No. 18-1 at 15–16.)

28  /////

Based on these representations by the parties, the court preliminarily concludes that the parties' negotiation constituted genuine, informed, and arm's-length bargaining.

4.   <u>Substantive Fairness</u>

a.   *Adequacy of the Settlement Amount*

In evaluating the fairness of a settlement award, "the settlement's benefits must be considered by comparison to what the class actually gave up by settling." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020) (citing *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to [the] process [of evaluating settlements] . . . is the need to compare the terms of the compromise with the likely rewards of litigation.")). However, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as amended* (June 19, 2000) (citation omitted). To determine whether a settlement "falls within the range of possible approval," a court must focus on "substantive fairness and adequacy" and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080.

The parties in this case have agreed to a $995,000.00 Qualified Settlement Fund. (Doc. No. 30 at 10.) Assuming the various allocations described earlier in this order are awarded in full, approximately $688,750.00 will be available for distribution to Participating Class and FLSA Members. (*Id.* at 9–10, 31.) Of that, approximately 90% is allocated to the Net QSF, and the remaining 10% to the FLSA Net Fund. (*Id.*) The Net QSF and FLSA Net Fund will be distributed to the Participating Class and FLSA Members on a *pro rata* and non-reversionary basis, with any uncashed funds to be donated to the California Unclaimed Property Fund. (*Id.* at 31–32.)

Plaintiffs estimate, with the assistance of damages expert DM&A, that the maximum potential damages as to plaintiffs' claims are approximately $6.3 million, making the Qualified Settlement Fund of $995,000 an approximately 16% recovery of plaintiff's maximum potential

/////

24

claims.[13]   (*See* Doc. No. 18–1 at 16–17.)  This settlement amount is in the range of the percentage recoveries that California district courts—including this one—have found to be reasonable.  *See, e.g.*, *Singh v. Roadrunner Intermodal Servs., LLC*, No. 1:15-cv-01497-DAD-BAM, 2018 WL 2412325, at *7 (E.D. Cal. May 29, 2018), *modified*, No. 1:15-cv-01497-DAD-BAM, 2018 WL 4382202 (E.D. Cal. Sept. 13, 2018) (approving a settlement of about 12% of the estimated maximum damages); *Glass v. UBS Fin. Servs., Inc.*, No. 3:06-cv-04068-MMC, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007) (approving a settlement of about 25–35% of the estimated maximum).  In addition, the recovery is allocated such that employees will receive payouts that scale directly with their number of weeks worked.  (Doc. No. 30 at 31.)

Plaintiffs assert that the settlement's recovery rate and *pro rata* allocation method is appropriate and fair for several reasons.  (Doc. No. 18-1 at 17–19.)  First, plaintiffs note that plaintiffs' counsel "engaged in a thorough review and analysis of the relevant documents and data with the assistance of an expert" which allowed plaintiffs' counsel to make an "intelligent evaluation" as to the value of plaintiffs' claims.[14]  (*Id.* at 16, 23.)  Second, plaintiffs' counsel discounted the maximum potential recovery for several reasons, including the uncertainty in proving certain damages at trial and the rulings of some California state courts that meal and rest period violations do not give rise to wage statement or waiting time penalties.  (*Id.* at 17 (citing *Ling v. P.F. Chang's China Bistro, Inc.*, 245 Cal. App. 4th 1242, 1261 (2016)).)  Plaintiffs also aver that although they believe it would have been possible to prevail at trial, the defenses asserted by defendant in this case "presented serious threats" to plaintiffs' claims that "could eliminate or substantially reduce any recovery to the Class."  (*Id.* at 18.)  In addition, plaintiffs

---

[13]  Counsel is directed to, in the future, detail and summarize quantitative data using clearly organized tables, charts, etc., that would permit the court to easily verify counsel's assertions. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1204 n.4 (9th Cir. 2013) (noting that district courts can order parties to re-format and re-submit records in a more usable format).

[14]  It is unclear from the face of plaintiffs' pending motion whether the valuation of plaintiffs' FLSA overtime and minimum wage claims included the liquidated damages provided for by law. *See* 29 U.S.C. § 216(b).  In plaintiffs' motion for final approval of the class and collective action settlement, plaintiffs' counsel is directed to clarify whether liquidated damages under the applicable statute were included in the $6.3 million estimate and if not, why not.

1    assert that there was a "significant risk" that plaintiffs would have been unable to obtain class

2    certification and maintain a certified class through trial, given that defendant "forcefully opposed

3    the propriety of class certification," rendering it a "hotly disputed" issue in this action.  (*Id.* at 19.)

4         Finally, plaintiffs' counsel asserts that they have previously litigated and settled similar

5    claims and other actions and are of the opinion that the settlement in this action is fair, reasonable,

6    and adequate, and is in the best interests of the Class.  (Doc. No. 18-2 at 11–12.)  The court also

7    observes that $1,239.00, the average recovery that Class and FLSA Members can expect to

8    receive under the proposed settlement, is significant given the Class Members' estimated average

9    hourly pay of $25.16.  (*Id.* at 16–17); *see Castro*, 2020 WL 1984240, at *14 (finding that Class

10   and FLSA Member payments between $505.74 and $4,045.96 and $126.44 and $1,011.49,

11   respectively, are significant for employees with an average hourly pay of $15.70); *Cavazos v.*

12   *Salas Concrete Inc.*, No. 1:19-cv-00062-DAD-EPG, 2022 WL 506005, at *16 (E.D. Cal. Feb. 18,

13   2022) (noting that an average settlement award of $2,145.30 is significant for employees who

14   typically earn $19.17 per hour).  Likewise, the court notes that the *pro rata* allocation formula

15   employed here is fair and reasonable because each Class and FLSA Member is allocated a payout

16   that scales directly with their weeks worked, and any Class and FLSA Member may dispute the

17   number of workweeks attributed to them.  (*See* Doc. No. 30 at 46.)

18        While "a larger award was theoretically possible, 'the very essence of a settlement is

19   compromise, a yielding of absolutes and an abandoning of highest hopes.'"  *Barbosa v. Cargill*

20   *Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) (citing *Linney v. Cellular Alaska P'ship*,

21   151 F.3d 1234, 1242 (9th Cir. 1998) (internal citations and quotation marks omitted)).  For all of

22   these reasons, the court will preliminarily approve the settlement amount reflected in the

23   proposed settlement.

24              b.    *PAGA Penalties*

25        The settlement also provides for $10,000.00 in civil PAGA penalties.  (Doc. No. 30 at 9.)

26   Pursuant to the PAGA, 75% of the civil penalties, or $7,500.00, will go to the LWDA, and 25%,

27   or $2,500.00, will be distributed to Aggrieved Employees on a *pro rata* basis.  (*Id.*)  *See* Cal. Lab.

28   Code § 2699(i).

Of the damages and penalties estimates provided by plaintiffs' counsel, it is unclear which amounts were specifically estimated in connection with PAGA penalties.[15]  However, plaintiffs' counsel estimate a total of $2,217,080.00 in penalties in this action, which plaintiffs' counsel discounted, as described above.  (Doc. No. 18-1 at 16–17.)

The resulting $10,000.00 civil penalty proposed by the settlement thus represents 1% of the $995,000.00 QSF.  The amount proposed to settle plaintiffs' PAGA claims is consistent with other PAGA settlements approved by this court.  *See, e.g., Syed v. M-I, LLC*, No. 1:12-cv-01718-DAD-MJS, 2017 WL 714367, at *13 (E.D. Cal. Feb. 22, 2017) (approving PAGA penalties representing 1.4% of the gross settlement fund); *Garcia v. Gordon Trucking, Inc.*, No. 1:10-cv-0324-AWI-SKO, 2012 WL 5364575, at *7 (E.D. Cal. Oct. 31, 2012) (approving PAGA penalties representing 0.27% of the gross settlement fund); *Castro*, 2020 WL 1984240, at *15 (approving PAGA penalties representing 2% of the gross settlement fund).  The court therefore preliminarily concludes that the settlement of plaintiff's PAGA claims is fair, reasonable, and adequate in light of the PAGA's public policy goals.  *See O'Connor*, 201 F. Supp. 3d at 1133.

### c.   *Attorneys' Fees*

When a negotiated class action settlement includes an award of attorneys' fees, the district court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount."[16]  *Bluetooth*, 654 F.3d at 941; *see also Knisley v. Network Assocs., Inc.*, 312 F.3d 1123, 1125 (9th Cir. 2002) (citation omitted).  Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial."  *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (citation omitted).  As a result, the district court must assume a fiduciary role for the class members and "act with a jealous regard to the rights of those who are

---

[15]  In plaintiffs' motion for final approval, plaintiffs' counsel are directed to clearly enumerate in a table or chart the estimated damages calculations in this case and specifically state which estimates are attributable to civil PAGA penalties.

[16]  This requirement also flows from the court's obligation to review and approve any FLSA settlements.  *See Kerzich v. Cty. of Tuolumne*, No. 1:16-cv-01116-DAD-SAB, 2019 WL 1755496, at *2 (E.D. Cal. Apr. 19, 2019) (listing cases).

1   interested in the fund in determining what a proper fee award is." *Id.* (internal quotation marks

2   and citations omitted).

3        In evaluating the award of attorneys' fees, "courts have discretion to employ either the

4   lodestar method or the percentage-of-recovery method." *Bluetooth*, 654 F.3d at 942 (citations

5   omitted). Under either approach, "[r]easonableness is the goal, and mechanical or formulaic

6   application of either method, where it yields an unreasonable result, can be an abuse of

7   discretion." *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir.

8   2002).

9        Under the percentage of the fund method, the court may award class counsel a percentage

10  of the common fund recovered for the class; in the Ninth Circuit, the benchmark is 25%. *Id.* at

11  1007, 1047–48; *see also Bluetooth*, 654 F.3d at 942. Special circumstances that could justify

12  varying the benchmark award include when counsel achieves exceptional results for the class,

13  undertakes extremely risky litigation, generates benefits for the class beyond simply the cash

14  settlement fund, or handles the case on a contingency basis. *See In re Online DVD-Rental*

15  *Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015). An explanation is necessary when the

16  court departs from the 25% benchmark, *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir.

17  2000), but either way, "[s]election of the benchmark or any other rate must be supported by

18  findings that take into account all of the circumstances of the case." *Vizcaino v. Microsoft Corp.*,

19  290 F.3d 1043, 1048 (9th Cir. 2002).

20       With the lodestar method, the court multiples the number of hours the prevailing party

21  reasonably spent litigating the case by a reasonable hourly rate for counsel. *Bluetooth*, 654 F.3d

22  at 941. The product of this computation, the "lodestar" amount, yields a presumptively

23  reasonable fee. *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

24       The Ninth Circuit has recommended that district courts apply one method but cross-check

25  the appropriateness of the determined amount by employing the other as well. *See Bluetooth*, 654

26  F.3d at 944. This diligence is particularly important "when counting *all* hours expended" in a

27  case "where the plaintiff has achieved only limited success" would yield an "excessive amount"

28  of fees, or when awarding a percentage of a "megafund would yield windfall profits for class

28

counsel in light of the hours spent on the case." *Bluetooth*, 654 F.3d at 942 ("Just as the lodestar method can confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate, the percentage-of-recovery method can likewise be used to assure that counsel's fee does not dwarf class recovery.") (internal quotation marks and citations omitted).  Similarly, an upward adjustment could be justified if the recovery is "too small . . . in light of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

Here, the settlement provides that class counsel will seek an award of 25% of the QSF, equivalent to $248,750.00.[17]  (Doc. No. 30 at 18.)  This fee amount is consistent with the benchmark rate in the Ninth Circuit.  *See In re Bluetooth*, 654 F.3d at 947.  As such, the court will approve the attorneys' fee request on a preliminary basis.  However, in connection with the final

/////

/////

/////

/////

/////

---

[17]  The settlement also provides for up to $15,000.00 in litigation costs.  (Doc. No. 30 at 18.) Although the proposed class notice in this action states that plaintiffs' counsel "has been paying all litigation costs and expenses" thus far, plaintiffs' counsel have not submitted a list of litigation expenses incurred thus far, nor any information that supports the $15,000.00 request.  (*Id.* at 44.) Although this amount of costs is not *per se* unreasonable for counsel to have accrued in multiple years of litigating a class action, *see, e.g.*, *Castro*, 2020 WL 1984240, at *3, 19 (granting preliminary approval of a proposed settlement providing for up to $55,000.00 in litigation costs), the court is not able to conclude on the evidence currently before it that an award of up to $15,000.00 is reasonable and necessary here.  Given the proceedings in this action, which include the filing of three amended complaints, a notice of removal, the pending motion for preliminary approval, and supplemental briefing as to that motion, the court finds that documented litigation costs of up to $10,000 would be fair, reasonable, and adequate for the purposes of preliminary approval.  *See, e.g.*, *Alberto v. GMRI, Inc.*, No. 2:07-cv-01895-WBS-DAD, 252 F.R.D. 652, 665 (E.D. Cal. 2008) (granting preliminary approval of a class action settlement in which $10,000 of the $435,000 settlement fund would be allocated to documented litigation costs, but requiring class counsel to submit an application for reimbursement of costs).  Nonetheless, plaintiffs' counsel are directed to provide an accounting for the requested $15,000.00 in litigation costs in seeking final approval of the settlement.  At that time, the court will carefully re-examine the amount of litigation costs to be awarded as part of the settlement.

1  fairness hearing, the court will consider any objections as well as the evidence presented by

2  counsel in order to determine whether the fee award of 25% is reasonable in this case.[18]

3             d.     *Incentive Payment*

4        While incentive awards are "fairly typical in class action cases," they are discretionary

5  sums awarded by the court "to compensate class representatives for work done on behalf of the

6  class, to make up for financial or reputational risk undertaken in bringing the action, and,

7  sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W.*

8  *Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009); *see also Staton v. Boeing Co.*, 327 F.3d 938,

9  977 (9th Cir. 2003) ("[N]amed plaintiffs . . . are eligible for reasonable incentive payments.").

10 Such payments are to be evaluated individually, and the court should look to factors such as "the

11 actions the plaintiff has taken to protect the interests of the class, the degree to which the class has

12 benefitted from those actions . . . the amount of time and effort the plaintiff expended in pursuing

13 the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." *Staton*, 327 F.3d at 977

14 (citation omitted).

15       Here, plaintiffs have requested incentive payments of $10,000.00 each.  (Doc. No. 18-1 at

16 10, 20.)  According to the declarations of plaintiffs Mondrian and Jones, they have been "actively

17 involved" in the case, including through having "several conversations" with counsel regarding

18 defendants' company policies; "gathering documents, providing information and answering

19 

20    [18]  Although plaintiffs' counsel assert that the proposed settlement "is an excellent result" for the

21 Class, the settlement negotiations were "hard-fought and aggressive with capable advocacy on
   both sides," and the requested 25% benchmark amount for attorneys' fees is presumed to be

22 reasonable, plaintiffs' counsel have not submitted any information regarding the number of hours
   they have spent reasonably litigating this action or their hourly rates.  (Doc. No. 18-1 at 16; 18-2

23 at 3, 11.)  Therefore, the court is unable to conduct a lodestar cross-check at this time.  Plaintiffs'
   counsel are directed to provide the court with detailed documentation pertaining to their hours

24 spent working on this matter and their hourly rates at the final approval stage.  At that time, the
   court will carefully re-examine the award of attorneys' fees and conduct a lodestar cross-check.

25 *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) ("The 25% benchmark rate,
   although a starting point for analysis, may be inappropriate in some cases"); *Perez v. All Ag, Inc.*,

26 No. 1:18-cv-00927-DAD-EPG, 2020 WL 1904825, at *9 (E.D. Cal. Apr. 17, 2020) ("Though the
   court may well grant an award of that size under certain circumstances, the court cannot abdicate

27 its obligation to protect the rights of absent members by simply defaulting to the method [of
   determining attorneys' fees] proffered by plaintiffs.").

28

1   questions so that [their] attorneys could analyze everything [they] provided to them and assess the

2   strength of [their] claims"; reviewing the complaint before it was filed; communicating with their

3   attorneys by phone and email on a regular basis regarding the status of the case; reviewing case-

4   related documents online "from time to time" to keep up with developments in the lawsuit; being

5   available by telephone during mediation; and speaking with his attorneys regarding the terms of

6   the proposed settlement.  (Doc. No. 18-2 at 93–94, 101–02.)  They further affirm that "[b]y

7   sticking [their] neck[s] out" and fighting for their and the Class Members' rights, they undertook

8   the risk that their current or future employers would know they had brought this lawsuit.  (*Id.* at

9   93, 101.)  Similarly, they knew they could potentially be responsible for paying some or all of

10  defendant's legal costs.  (*Id.*)  Plaintiffs represent that these risks caused them "significant stress

11  and anxiety," and although they did not keep formal time records, they estimate that they have

12  each spent between 40 and 50 hours working on this case.  (*Id.* at 93–94, 101–02.)

13         According to the calculations provided by plaintiffs, Participating Class and FLSA

14  members will receive an average settlement payment of around $1,239.00, based on each

15  Member's weeks worked.  (Doc. No. 18-1 at 17.)  Thus, incentive awards of $10,000 are roughly

16  eight times the average amount each Class and FLSA Member could expect to receive from the

17  proposed settlement.  Though this figure is not necessarily excessive, *see, e.g.*, *Aguilar v.*

18  *Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 2214936, at *8 (E.D. Cal. May

19  19, 2017) (approving an incentive award of $7,500 to each class representative where average

20  class recovery was approximately $500), the Ninth Circuit has repeatedly urged district courts to

21  be "vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy

22  of the class representatives."  *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir.

23  2013) (citation omitted).

24         Having reviewed the proposed $10,000.00 incentive awards, the court notes that the

25  amount requested may be disproportionate given the possible disparity with the settlement's

26  average or median award.  However, in recognition of the initiative and general well-

27  preparedness demonstrated by plaintiffs thus far, the court will preliminarily approve the

28  incentive awards on the condition that plaintiffs demonstrate at the final approval stage that the

1  requested awards are commensurate with and do not dwarf the average or median award received

2  by the Class and FLSA Members. [19]

3                    e.    *Release of Claims*

4         All Class Members who do not timely opt-out of the settlement will be deemed to have

5  released defendant from the Released Claims, with the exception of the claims for overtime under

6  the FLSA.  (Doc. No. 30 at 9, 35.)  For FLSA Members, FLSA claims will only be released for

7  those who affirmatively opt-in.  (*Id.*)  Altogether, the Released Claims arguably track plaintiffs'

8  claims in this action and the settlement does not appear to release unrelated claims that Class and

9  FLSA Members may have against defendant.

10        As noted above, all Aggrieved Employees are subject to the release of the Released

11  PAGA Claims, whether or not they opt-out of the Class, and the Aggrieved Employees will

12  receive a *pro rata* share of the $2,500.00 PAGA payment representing 25% of the $10,000.00

13  PAGA settlement in this action.  (*Id.* at 35–36.)  Plaintiffs argue that "[u]nder PAGA, the claim

14  for civil penalties belongs to the State of California, and therefore does not impact the claims of

15  the individuals."  (Doc. No. 27 at 8.)  As such, "the resolution of the PAGA claim extinguishes

16  the entire claim as it could have been brought by the government, regardless of whether an

17  individual opts out from the class settlement."  (*Id.* (citing *Turrieta v. Lyft, Inc.*, 69 Cal. App. 5th

18  955, 974 (2021) ("[U]nlike a class action, PAGA has no notice requirements for unnamed

19  aggrieved employees, nor may such employees opt out of a PAGA action.")).)  On this basis, the

20  court concludes that the Released PAGA Claims appropriately track the claims at issue in this

21  case and are not overbroad.  *See also Sakkab v. Luxottica Retail North Am., Inc.*, 803 F.3d 425,

22  436 n.10 (9th Cir. 2015) ("A judgment in a PAGA action binds absent employees because it binds

23  the government agency tasked with enforcing the labor laws.")

24  /////

25  /////

26  _____

27  [19]  Plaintiffs have provided the court with the average award expected from the settlement, but have not provided the court with estimates regarding the expected median, minimum, or maximum awards.  Plaintiffs are directed to provide this information in their motion for final

28  approval of the class and collective action settlement.

1    **D.    Proposed Class Notice and Administration**

2         For proposed settlements under Rule 23, "the court must direct notice in a reasonable

3    manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); *see*

4    *also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement

5    under Rule 23(e)."). For a class certified under Federal Rule of Civil Procedure 23(b)(3), the

6    notice must contain, in plain and clear language:  (1) the nature of the action; (2) the definition of

7    the class certified; (3) the class claims, issues, or defenses; (4) the right of a class member to

8    appear through an attorney, if desired; (5) the right to be excluded from the settlement; (6) the

9    time and manner for requesting an exclusion; and (7) the binding effect of a class judgment on

10   members of the class.  Fed. R. Civ. P. 23(c)(2)(B).

11        A class action settlement notice "is satisfactory if it generally describes the terms of the

12   settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

13   forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)

14   (internal quotation marks and citations omitted).

15        For proposed settlements under the FLSA, "the court [must] provide potential plaintiffs

16   'accurate and timely notice concerning the pendency of the collective action, so that they can

17   make informed decisions about whether or not to participate.'" *Adams v. Inter–Con Sec. Sys.*,

18   242 F.R.D. 530, 539 (N.D. Cal. 2007) (quoting *Hoffmann–La Roche v. Sperling*, 493 U.S. 165,

19   170 (1989)); *see generally* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any

20   such action unless he gives his consent in writing to become such a party and such consent is filed

21   in the court in which such action is brought.").

22        In addition, "courts considering approval of settlements in these hybrid [Rule 23 and

23   FLSA] actions consistently require class notice forms to explain:  '(1) the hybrid nature of th[e]

24   action; [] (2) the claims involved in th[e] action; (3) the options that are available to California

25   Class members in connection with the settlement, including how to participate or not participate

26   in the Rule 23 class action and the FLSA collection action aspects of the settlement; and (4) the

27   consequences of opting-in to the FLSA collective action, opting-out of the Rule 23 class action,

28   or doing nothing.'" *Thompson v. Costco Wholesale Corp.*, No. 14-cv-2778-CAB-WVG, 2017

1   WL 697895, at *8 (S.D. Cal. Feb. 22, 2017) (quoting *Pierce v. Rosetta Stone, Ltd.*, No. 4:11-cv-

2   01283-SBA, 2013 WL 1878918, at *4 (N.D. Cal. May 3, 2013)).

3         Here, the Settlement Agreement provides that the Settlement Administrator will receive a

4   list identifying each Class Member, culled from defendant's business records.  (Doc. No. 30 at

5   22.)  Within ten days of defendant providing that information, the Settlement Administrator will

6   send a Notice Packet to all Class Members via first-class mail.  (*Id.*)  The Settlement

7   Administrator will then re-mail any Notice Packets that are returned to the Settlement

8   Administrator within seven business days of receiving the undelivered materials.  (*Id.* at 23.)  The

9   response date for the FLSA Consent Forms, written objection, disputes, and opt-outs will be

10  extended by fifteen days for any re-mailed Notice Packets, and the new deadline will be reflected

11  on these materials.  (*Id.*)  In addition, the Settlement Administrator will provide the parties with

12  weekly status reports and will process any opt-out requests, FLSA Consent Forms, and objections

13  to the settlement.  (*Id.* at 23–25.)

14        The Notice Packet includes a Notice of Pendency of Class Action Settlement and an

15  FLSA Consent Form that describe both the class action settlement and the collective action

16  settlement.  (Doc. No. 30 at 43–48, 66–67.)  The Notice Packet includes an overview of this

17  lawsuit, an overview of the released claims, instructions for opting out of the class action

18  settlement, instructions for opting into the FLSA settlement, an estimate of the Class Member's

19  estimated settlement share, instructions for Class Members to dispute their calculation of the

20  settlement share and/or weeks worked during the Class Period, instructions for objecting to the

21  settlement, information about the final approval hearing for the settlement and their right to

22  appear through an attorney, and instructions for accessing documents related to the settlement.

23  (*Id.*)  The Notice Packet does not reference or describe the "Right to Rescind" section of the

24  /////

25  /////

26  /////

27  /////

28  /////

1    Settlement Agreement, under which defendant retains the right to void the settlement if more than

2    5% of the Class Members opt-out of the settlement.[20]  (Doc. No. 30 at 26.)

3        The court finds that the notice and the manner of notice proposed by plaintiffs meet the

4    requirements of Federal Civil Procedure Rule 23(c)(2)(B) and 29 U.S.C. § 216(b) and that the

5    proposed mail delivery is appropriate under these circumstances.

6    /////

7    /////

8

---

9    [20]  The court previously expressed concern over this "blow up" provision and directed the parties

10    to provide authority for why this provision—and specifically, the 5% threshold—is reasonable, fair, and adequate under Rule 23.  (Doc. No. 22 at 5.)  In their supplemental memorandum,

11    plaintiffs assert that the parties "do not anticipate a 5% opt out, because they represent that almost

12    never occurs," but that if defendant would not get the benefit of a full release of claims as to at least 95% of the Class Members, the parties have agreed that this change in circumstances would

13    be significant enough to allow defendant to rescind the settlement if it so chooses.  (Doc. No. 27 at 9.)  Plaintiffs contend that such a rescission would not impact the rights of the class members,

14    because they would not be bound by the settlement.  (*Id.*)  In addition, plaintiffs explain that the provision "is only intended to address the situation where there is a widespread and coordinated

15    opt-out campaign in which the Defendant pays the class settlement amount but is still forced to

16    deal with an[] unanticipated multiplicity of additional lawsuits covering the same claims." (*Id.* at 10.)  As to the choice of the 5% threshold in particular, plaintiffs represent that they chose this

17    number because 5% is "well above what normally occurs, . . . . [so] if 5% of the Class Members opt-out, it could be an indication of their dissatisfaction with the Settlement." (*Id.*)  In support of

18    their assertion that a 5% opt-out "almost never occurs," plaintiffs state that "[i]n the hundreds of class settlements conducted by Class Counsel, this 5% threshold for opt-outs has never been

19    met." (*Id.* at 9–10.)  In light of plaintiffs' arguments and relevant case law, the court preliminarily deems the provision here reasonable, fair, and adequate.  *See Dynabursky v.*

20    *Alliedbarton Security Services, LP*, No. 8:12-cv-02210-JLS-RNB, 2016 WL 8921915, at *13, *2 n.1 (C.D. Cal. Aug. 15, 2016) (granting preliminary approval of a settlement agreement involving

21    a blow up clause with a 10% opt-out threshold); *Four In One Co., Inc. v. S.K. Foods, L.P.*, No.

22    2:08-cv-03017-KJM-JDP, 2014 WL 28808, at *8, *14 (E.D. Cal. Jan. 2, 2014) (granting preliminary approval of a settlement agreement involving a blow up clause with a 25% opt-out

23    threshold); *del Toro Lopez v. Uber Technologies, Inc.*, No. 4:17-cv-06255-YGR, 2018 WL 5982506, at *25 (N.D. Cal. Nov. 14, 2018) (granting final approval of settlement agreement

24    involving a blow up clause with a 5% opt-out threshold); *Jones v. Canon Business Solutions, Inc.*, No. 2:12-cv-07195-JAK-JEM, 2014 WL 12772083, at *5, *16 (C.D. Cal. Sept. 2, 2014) (granting

25    final approval of a settlement agreement involving a blow up clause with a 10% opt-out

26    threshold); *see also Medina v. NYC Harlem Foods Inc.*, No. 1:21-cv-01321-VSB, 2022 WL 1184260, at *6 (S.D.N.Y. Apr. 21, 2022) ("Blow-up provisions thus encourage settlement by

27    allowing defendants to limit their potential liability.  Blow up provisions also give plaintiff's counsel leverage to negotiate the strongest possible settlement to discourage opt outs.") (internal

28    citation omitted).

**E.     Settlement Administrator and Settlement Administration Costs**

The parties have agreed to retain ILYM Group ("ILYM") to handle the notice and claim administration process.  (Doc. No. 30 at 7.)

The estimated cost of administering this settlement is "less than $15,000," which will be deducted from the Qualified Settlement Fund.  (*Id.*)  This estimate is consistent with, and in some cases lower than, other settlements submitted to this court.  *See, e.g.*, *Castro*, 2020 WL 1984240, at *19 (administration costs of $15,000 for a $3.75 million settlement); *Gonzalez v. CoreCivic of Tennessee, LLC*, No. 1:16-cv-01891-DAD-JLT, 2020 WL 1475991, at *14 (E.D. Cal. Mar. 26, 2020) (administration costs of $15,000 for a $3.2 million settlement); *Dakota Med., Inc. v. RehabCare Grp., Inc.,* No. 1:14-cv-02081-DAD-BAM, 2017 WL 1398816, at *5 (E.D. Cal. Apr. 19, 2017) (administration costs of $94,000 for a $25 million settlement); *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 117789, at *7 (E.D. Cal. Jan. 11, 2017) (administration costs of $45,000 for a $4.5 million settlement).

Accordingly, the court will appoint ILYM as the Settlement Administrator.

**F.     Implementation Schedule**

Plaintiffs have proposed an implementation schedule which may be summarized by the below table:

| Event | Date |
|---|---|
| Deadline for defendant to provide the Settlement Administrator and Class Counsel with an updated list of Class and FLSA Members ("Class Data") | Ten (10) days after the date of service of entry of the Preliminary Approval Order |
| Deadline for the Settlement Administrator to send a Notice Packet to each Class and FLSA Member | Ten (10) days after receipt of the Class Data |
| Deadline to file a Notice of Objection, Election Not to Participate in Settlement, and/or FLSA Consent Form | Forty-five (45) days after the initial mailing of the Notice Packet (the "Response Deadline") |
| Deadline for Class and FLSA Members to file a work weeks dispute | By the Response Deadline |

| | |
|---|---|
| Deadline to file a Notice of Objection, Election Not to Participate in Settlement, and FLSA Consent Form for re-mailed Notice Packets | Fifteen (15) days after the Response Deadline |
| Deadline for defendant to exercise right to rescind settlement if 5% or more of the class members opt-out | Fourteen (14) days after the Settlement Administrator notifies the parties of the total number of opt-outs |
| Deadline for defendant to deposit settlement amount with Settlement Administrator | Ninety (90) days after the date the Final Approval Order becomes final ("Effective Date") |
| Deadline for Settlement Administrator to issue checks to Class and FLSA Members and Aggrieved Employees | One hundred (100) days after the Effective Date |
| Deadline for recipients to cash Settlement Checks | One hundred eighty days (180) from the date it is issued or re-issued (if the initial check is returned as a result of an incorrect address) |
| Deadline for plaintiffs to file a motion for final approval | Sixteen (16) days before the final approval hearing |

(*See* Doc. No. 30 at 22–26, 29–30, 32, 46.)  However, the court makes the following adjustments to the parties' proposed implementation schedule.  First, the court adds a deadline for the Settlement Administrator to send a cure letter to Class Members who submit a defective Election Not to Participate in Settlement and/or FLSA Consent Form, which shall be three (3) days after receipt of a defective request for exclusion or FLSA Consent Form.  Second, the court changes the deadline for the parties to file a motion for final approval to be at least 28 days in advance of the final approval hearing.  With these adjustments, the court will approve the parties' proposed implementation schedule.

## CONCLUSION

Accordingly:

1.   Plaintiffs' motion for preliminary approval of class action settlement (Doc. No. 18) is granted;

2.   The proposed class identified in the Settlement Agreement (Doc. No. 30) is certified for settlement purposes;

37

3.     Plaintiffs' counsel, Blumenthal Nordrehaug Bhowmik de Blouw LLP, is appointed as class counsel for settlement purposes;

4.     The named plaintiffs, Augustus Mondrian and Rhonda Jones, are appointed as class representatives for settlement purposes;

5.     ILYM is approved as the settlement claims administrator;

6.     The proposed notice (Doc. No. 30 at 43–48, 66–67) is approved in accordance with Federal Rule of Civil Procedure 23;

7.     The proposed settlement (Doc. No. 30) detailed herein is approved on a preliminary basis as fair and adequate;

8.     The hearing for final approval of the proposed settlement is set for September 30, 2022 at 1:00 p.m. before the assigned district judge in Courtroom 5, with the motion for final approval of class action settlement to be filed at least 28 days in advance of the final approval hearing, in accordance with Local Rule 230(b);

    a.     Among other things the parties deem appropriate, the parties are direct to provide the court with the information in footnotes 6, 10, 11, 12, 13, 15, 17, 18, and 19 in connection with plaintiffs' motion for final approval of class action settlement; and

9.     The settlement implementation schedule set forth above, as modified by the court, is adopted.

IT IS SO ORDERED.

Dated:   **June 27, 2022**                                

                                              UNITED STATES DISTRICT JUDGE